# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

Jacqueline Allen, individually and on behalf of herself and all others similarly situated,

Plaintiff,

vs.

M&T Bank Corporation, Manufacturers and Traders Trust Company, M&T Bank Employee Benefit Plans Committee, Wilmington Trust Investment Advisors, Wilmington Funds Management Corporation, Wilmington Trust Corporation, Robert G. Wilmers, Michael P. Pinto, Mark J. Czarnecki, and John Does 1-40,

Defendants.

Civil Action No.: _____

## COMPLAINT

Plaintiff Jacqueline Allen, by and through her attorneys, on behalf of the M&T Bank Corporation Retirement Savings Plan[1] (the "Plan"), herself and all others similarly situated, alleges the following.

## INTRODUCTION

1.     This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1009 and 1132 against M&T Bank Corporation ("M&T" or the "Company"), Manufacturers and Traders Trust Company ("M&T Bank"), M&T Bank Employee Benefit Plans Committee (the "Committee"), Wilmington Trust Investment Advisors ("WTIA"), Wilmington Funds Management Corporation ("WFMC"),

---

[1] The Plan includes retirement plans that were previously separate prior to the purchase of Wilmington Trust Bank.

Wilmington Trust Company ("Wilmington Trust"), Robert G. Wilmers, Michael P. Pinto, Mark J. Czarnecki, John Does 1-20 (the "Board members"), and John Does 20-40 (the "Committee members").

2.     Plaintiff was a participant in the Plan during the Class Period (defined below), during which time the Plan's fiduciaries breached their duties of loyalty and prudence to the Plan and its participants by including higher cost and poorly performing proprietary investment options in the Plan to the detriment of Plan participants.

3.     401(k) plans confer benefits on participating employees to incentivize saving for retirement and/or other long-term goals.  An employee participating in a 401(k) plan is limited to the investment options selected by the plan's fiduciaries.  In selecting and maintaining proprietary funds, investment options that both cost more than and severely underperformed other mutual funds, in the Plan, Defendants engaged in self-dealing, costing the Plan participants millions of dollars.

4.     Plaintiff alleges that Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duties owed to them and to the other participants and beneficiaries of the Plan in violation of §§ 404(a) and 405, 29 U. S. C. §§ 1104(a) and 1105, particularly with regard to the Plan's selection and maintenance of M&T's mutual funds, later Wilmington Trust's mutual funds, as investment options.

5.     Specifically, Plaintiff alleges in Count I that Defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to prudently and loyally manage the Plan's investments by:  (1) retaining their proprietary funds within the Plan despite the availability of similar lower cost and better performing investment options; (2) continuing to offer proprietary funds as investment options when it was imprudent to do so due to their underperformance

compared to benchmarks; and (3) failing to offer collective trusts as options to the mutual funds in the Plan, despite their far lower fees.  These actions/inactions cost Plan participants millions of dollars and run directly counter to the express purpose of ERISA pension plans, which are designed to help provide funds for participants' retirement.  *See* ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY").

6.     Plaintiff's Count II alleges that Defendants breached their fiduciary duties by failing to adequately monitor other persons to whom management/administration of Plan assets was delegated, despite the fact that such Defendants knew or should have known that such other fiduciaries were imprudently allowing the Plan to continue to offer them proprietary funds as an investment option and investing Plan assets these funds when it was no longer prudent to do so.

7.     This action seeks losses to the Plan for which Defendants are liable pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132.  Because Plaintiff's claims apply to the Plan, inclusive of all participants with accounts invested in the proprietary funds during the Class Period, and because ERISA specifically authorizes participants such as the Plaintiff to sue for relief to the Plan for breaches of fiduciary duty such as those alleged herein, Plaintiff brings this as a class action on behalf of the Plan and all participants and beneficiaries of the Plan during the proposed Class Period.

## JURISDICTION AND VENUE

8.     This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

9.      This Court has personal jurisdiction over Defendants because they are headquartered and transact business in, or reside in, and have significant contacts with, this District, and because ERISA provides for nationwide service of process.

10.      Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## PARTIES

### Plaintiff

11.      Plaintiff Jacqueline Allen is a citizen and resident of Wilmington, Delaware. Plaintiff was a participant in the Plan until 2014. While a participant, and within the applicable statute of limitations, Plaintiff invested in the Wilmington Broad Market Bond Fund and the Wilmington Strategic Allocation Conservative Fund.

### Defendants

12.      Defendant M&T is a bank holding company incorporated under the laws of New York in 1969. Headquartered in Buffalo, New York, M&T has two principal banking subsidiaries, M&T Bank and Wilmington Trust, National Association.

13.      Defendant M&T Bank is the Plan Sponsor and was originally founded as "Manufacturers and Traders Trust Company" in 1856. M&T Bank is headquartered in Buffalo, New York, sharing an address with its corporate parent, M&T. M&T Bank is the main banking subsidiary of M&T, and as such, is a banking corporation incorporated under the laws of New York.

14.     Defendant M&T Bank Employee Benefit Plans Committee is the Plan Administrator and its members are appointed by the Board of Directors of M&T Bank.

15.     Defendant WTIA provides advisory services for the Wilmington Funds to the Plan, as well as recommendations related to the other investment options within the Plan.  WTIA is a wholly owned subsidiary of M&T Bank, which does not pay any fees on behalf of the Plan.  The only compensation WTIA therefore receives is from the fees assessed to the holdings of Plan participants in its mutual funds.  WTIA is a Maryland corporation headquartered in Baltimore, Maryland.

16.     Defendant WFMC is the Wilmington Funds adviser and manager.  WFMC is a wholly owned subsidiary of Wilmington Trust.  Upon information and belief, WFMC received a portion of the fees assess to the holdings of Plan participants in its mutual funds.  WFMC is a Delaware corporation headquartered in Wilmington, Delaware.

17.     Defendant Wilmington Trust is a wholly owned subsidiary of M&T.  Originally incorporated as a Delaware bank and trust company, in 2011 it became a nondepository trust company.  Its headquarters are in Wilmington, Delaware.

18.     Defendant Robert G. Wilmers is chief executive officer, chairman of the board and a director of M&T.  He is also the chief executive officer, chairman of the board and a director of M&T Bank.  He has held all of these positions from the beginning of the Class Period.  In his role as a director for M&T Bank, he is responsible for selecting the members of the Committee.

19.     Defendant Michael P. Pinto was a vice chairman and a director of M&T Bank for a portion of the Class Period.  In his role as a director for M&T Bank, he was responsible for selecting the members of the Committee.

20.     Defendant Mark J. Czarnecki is president, chief operating officer and director of both M&T and M&T Bank.  He has held all of these positions from the beginning of the Class Period.  In his role as a director for M&T Bank, he is responsible for selecting the members of the Committee.

21.     Defendants John Does 1-20 are the unnamed members of the Board of Directors for M&T Bank who appointed members to the Committee.

22.     Defendant John Does 20-40 are the unnamed members of the Committee who acted as the Plan Administrator during the Class Period.

## THE PLAN

23.     The Plan is an employee benefit plan within the meaning of ERISA §§ 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A), and it is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).  Further, it is an "eligible individual account plan" within the meaning of ERISA § 407(d)(3), 29 U.S.C. § 1107(d)(3), and a "qualified cash or deferred arrangement" within the meaning of I.R.C. § 401(k), 26 U.S.C. § 401(k).

24.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provided for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account.  Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

25.     The Plan's original effective date was April 1, 1986.  It has been restated several times, most recently as of January 1, 2016.  *See* M&T Bank Corporation Retirement Savings Plan, Amendment 58 and January 1, 2016 Restatement, at 1.

26.      An employee becomes an eligible participant/employee as of the first day of the first payroll period following completion of a year of continuous service and attainment of age 21. *See* Plan, Amendment 58 and January 1, 2016 Restatement, at 10.

27.      Eligible employees "may make Employee Pretax Contributions by entering into a salary reduction agreement by which his [or her] Employer reduces the Employee's Benefit Compensation by a designated whole percentage (not exceeding 50%), and contributes that amount to the Plan on his [or her] behalf." *Id.* at 12.   Employee contributions are fully vested at all times. Prospectus and Summary Plan Description Dated January 1, 2016 for the M&T Bank Retirement Savings Plan, at 9.

28.      M&T Bank is the Plan Sponsor and its designee, the Committee, is the named Plan Administrator.  The members of the Committee are appointed by the Board of Directors for M&T Bank.

29.      The Committee has all necessary authority and discretion to "appoint 'investment managers' within the meaning of ERISA Section 3(38), and select, monitor and replace investment options in accordance with Section 9.10." *Id.* at 32.

30.      "Members of the Committee are fiduciaries of the Plan within the meaning of ERISA Section 3(21) when the Committee exercises its authority and discretion under" Section 9.1. *Id.*

## CLASS ACTION ALLEGATIONS

31.      Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and the proposed class (the "Class") defined as follows:

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between May 11, 2010 and the present (the "Class Period").

32.     The members of the Class are so numerous that joinder of all members is impractical.  Upon information and belief, the Class includes thousands of persons.

33.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff's claims, and the claims of all Class members, arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct.

34.     There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

A.     Whether Defendants are fiduciaries of the Plan;

B.     Whether Defendants breached their fiduciary duties of loyalty and prudence with respect to the Plan;

C.     Whether Defendants breached their duty of loyalty by including investment options which benefited themselves to the detriment of the Plan's participants;

D.     Whether Defendants failed to monitor the Plan's fiduciaries to ensure the Plan was being managed in compliance with ERISA; and

E.     Whether the Plan fiduciaries breached their fiduciary duties in failing to comply with the provisions of ERISA set forth above.

35.     Plaintiff will fairly and adequately represent the Class, and has retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiff has no interests antagonistic to those of other members of the Class.  Plaintiff is committed to the vigorous

prosecution of this action, and anticipates no difficulty in the management of this litigation as a class action.

36.     This action may be properly certified under either subsection of Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

37.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## DEFENDANTS' FIDUCIARY STATUS

38.     During the Class Period, upon information and belief, each Defendant was a fiduciary of the Plan, either as a named fiduciary or as a *de facto* fiduciary with discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

39.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

40.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

41.     At all times relevant to this Complaint, Defendants were fiduciaries of the Plan because:

(a)     they were so named; and/or

(b)     they exercised authority or control respecting management or disposition of the Plan's assets; and/or

(c)     they exercised discretionary authority or discretionary control respecting management of the Plan; and/or

(d)     they had discretionary authority or discretionary responsibility in the administration of the Plan.

42.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man actin gin a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

43.     Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration.  Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

44.     Instead of delegating all fiduciary responsibility for the Plan to external service providers, the Company chose to assign the appointment and removal of fiduciaries to the Committee, whose members were selected by the Company itself.

45.     During the Class Period, all of Defendants acted as fiduciaries of the Plan pursuant to ERISA § 3(21)(A), § 1002 (21)(A), and the law interpreting that section.

46.     The Company was and remains a fiduciary of the Plan, as a Plan Sponsor and as the Plan Administrator – through the Committee – for the entirety of the Class Period.

47.     As Plan Administrator, the Company exercised discretionary authority with respect to management and administration of the Plan and/or exercised authority or control over the management and disposition of the Plan's assets.

48.     Instead of delegating fiduciary responsibility for the Plan to external service providers, the Company chose to internalize certain vital aspects of this function to the Committee.

49.     As noted above, the Company acted through the Committee, which it named as Plan Administrator, as well as the committee members who were officers and employees of the Company.  The Company had, at all times, effective control over the activities of its officers and employees, appointed by the Company to perform Plan-related fiduciary functions in the course and scope of their employment, including over their Plan-related activities.

50.     By failing to properly discharge their fiduciary duties under ERISA, Defendants breached fiduciary duties they owned to the Plan, its participants and their beneficiaries.  Such individuals were appointed by the Company to perform Plan-related fiduciary functions in the course and scope of their employment.  Accordingly, the actions of such employee fiduciaries are imputed to the Company under the doctrine of *respondeat superior*, and the Company is liable for these actions.

51.     As noted above, the Committee members were appointed by the Company's Board of Directors.  The duties of the Committee included the appointment of the investment managers for the Plan, selection, monitoring and replacement of investment options for the Plan, and communication of information to participants as required under ERISA.

52.     The Committee Defendants were fiduciaries of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

53.     ERISA mandates that pension plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the Plan and its participants when communicating with them.

54.     The duty of loyalty also includes a mandate that the fiduciary display complete loyalty to the beneficiaries, and set aside the consideration of third persons.   As noted in an Advisory Opinion 88-16A by the Department of Labor:

> …in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment may not be influenced by non-economic factors unless the investment, when

> judged solely on the basis of its economic value to the plan, would
> be equal or superior to alternative investments available to the plan.

1988 WL 222716, at *3 (Dec. 19, 1988).

55.     During the Class Period, upon information and belief, the Defendants acted in the interests of the Company, to the detriment of the Plan and its participants and beneficiaries, by including mutual fund investments from the Company itself or a subsidiary in the Plan that were more expensive than comparable investments and investments with poor performance compared to benchmarks and their peers.

56.     Not only did the Defendants include these investments out of self-interest, they failed to disclose the conflict of interest to Plaintiff and members of the Class.

57.     Pursuant to 29 U.S.C. § 1104(a)(1)(B), ERISA also mandates that fiduciaries act with prudence in the disposition of Plan assets and selection and monitoring of investments including the monitoring and minimization of administrative expenses.

58.     During the Class Period, upon information and belief, Defendants selected investments for the Plan with higher administrative fees than were available on the market for similar or identical investment products from other providers.  Defendants also failed to monitor the performance of these investments and refused to remove the investments which performed well-below their benchmarks and their competitors.  Finally, Defendants failed to use collective trusts instead of mutual fund options that would have further minimized fees to the Plan and its participants, wasting millions of dollars.

## SUBSTANTIVE ALLEGATIONS

A.     <u>Investment Options Available to Plan Participants</u>

13

59.     M&T Bank was originally founded in 1856, under the name Manufacturers and Traders Bank.  Today M&T Bank operates as the main subsidiary of M&T, comprising "over 99% of the consolidated assets of the Company."  *See* M&T Bank Corporation 2015 Form 10-K at 4.

60.     The Company established and maintained the Plan for the benefit of the employees of M&T and all its subsidiaries.  The Plan included a number of investment options, as well as access to a self-directed brokerage account ("SDBA") which would allow Plan participants to invest in thousands of options, including stocks and mutual funds.

61.     The investment options offered within the Plan were mostly pooled investment products known as mutual funds, which are subject to lower fees because of the large value of the assets under management.  Throughout the Class Period, the investment options available to participants were almost exclusively mutual funds.

62.     Each investment option within the Plan charged certain fees, to be paid by deductions from the pool of assets under management.   For passively managed funds, which are designed to mimic a market index such as Standard & Poor's 500, securities were purchased to match the mix of companies within the index.  Because they are simply a mirror of an index, these funds offer both diversity of investment and comparatively low fees.

63.     By contrast, actively managed funds, which have a mix of securities selected in the belief they will beat the market, have higher fees, to account for the work of financial planners. However, long-term data suggests that actively managed funds "lagged their passive counterparts across nearly all asset classes, especially over a 10-year period from 2004 to 2014."  *See Index funds trounce actively managed funds: Study*, available at http://www.cnbc.com/2015/06/26/index-funds-trounce-actively-managed-funds-study.html.

64.     In fact, one of the key findings of the Morningstar study was:

> Actively managed funds have generally underperformed their passive counterparts, especially over longer time horizons, and experienced high mortality rates (i.e. many are merged or closed). In addition, the report finds that failure tends to be positively correlated with fees (i.e. higher cost funds are more likely to underperform or be shuttered or merged away and lower-cost funds were likelier to survive and enjoyed greater odds of success).

*See* Morningstar's Active/Passive Barometer: A new yardstick for an old debate, at 2 (June 2015) available at http://corporate.morningstar.com/US/documents/ResearchPapers/MorningstarActive-PassiveBarometerJune2015.pdf.

65.     Nor could fees be avoided by the use of the SDBA, which have even more fees than the investments typically available to plan participants, including account fees and trading fees. Further, those who invested in the mutual funds of their choice would have faced fees higher than those available to the Plan, because they would have to have purchased retail shares, rather than institutional shares which have lower fees due to the larger amount of assets under management.

66.     Moreover, under 29 § 2550.404c-1(d)(1)(iv), the availability and use of a SDBA does not ameliorate the fiduciary duty of the plan's administrators to select prudent and reasonable investment alternatives for the plan.

**B.     Improper Management of an Employee Retirement Plan Can Cost the Plan's Participants Millions in Savings**

67.     ERISA requires plan fiduciaries to provide diversified investment options for a defined-contribution plan.  *See* 29 U.S.C. § 1104(a)(1)(C)

68.     In addition to providing a diversified set of investment options for the Plan participants, under 29 U.S.C. § 1104(a)(1)(C), a plan fiduciary must also ensure that the costs of these investments are reasonable.  *See* U.S. Dep't of Labor, *A look at 401(k) Plan Fees*, (Aug. 2013), available at https://www.dol.gov/ebsa/publications/401k_employee.html (last visited INSERT) ("You should be aware that your employer also has a specific obligation to consider the

15

fees and expenses paid by your plan."). This is because, as described by the Department of Labor, a one percent difference in fees and expenses can reduce a participant's retirement account balance by 28 percent over 35 years. *Id.*

69.     In fact, the Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must:  (1) "establish a prudent process for selecting investment options and service providers;" (2) "ensure that fees paid to service providers and other expenses of the plan are reasonable in light of the level and quality of services provided;" and (3) "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties. *Id.*

70.     The duty to evaluate and monitor fees includes fees paid directly by Plan participants to investment providers, usually in the form of an expense ratio, or a percentage of assets under management within a particular investment.  *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, (August 2014), at 5.  "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id.* at 6.

71.     Because the investment choices for Plan participants are limited, Plan fiduciaries have a responsibility to take into account the reasonableness of any expense ratio when selecting a mutual fund or any other investment option for the Plan.

72.      On average, there are lower expense ratios for 401(k) participants than those for other investors.  *See The Economics of Providing 401(k) Plans*, at 10.   ERISA-mandated monitoring of investments lead to plan sponsors to continually evaluate performance and fees, leading to great competition among mutual funds in the marketplace.  Furthermore, the large

average account balances of 401(k) plans, especially the largest ones with over a $1 billion in assets managed, lead to economies of scale and special pricing within mutual funds.  *Id*.

73.     This has led to falling mutual fund expenses ratios for 401(k) plan participants since 2000.  In fact, these expense ratios have fallen 30 percent from 2000 to 2014 for equity funds, 24 percent for hybrid funds and 28 percent for bond funds.  *Id*. at 1.

74.     The following figure published by the ICI best illustrates that 401(k) plans on average pay far lower fees than regular industry investors, even as expense ratios for all investors continued to drop for the past several years[2].

FIGURE 7

**Average Total Mutual Fund Expense Ratios**
*Percent, 2012–2014*

|  | 2012 | | 2013 | | 2014 | |
|---|---|---|---|---|---|---|
|  | Industry[1] | 401(k)[2] | Industry[1] | 401(k)[2] | Industry[1] | 401(k)[2] |
| **Equity funds** | 0.77 | 0.63 | 0.74 | 0.58 | 0.70 | 0.54 |
| Domestic | 0.71 | 0.59 | 0.67 | 0.54 | 0.65 | 0.50 |
| World | 0.93 | 0.78 | 0.90 | 0.73 | 0.86 | 0.67 |
| **Hybrid funds** | 0.79 | 0.60 | 0.80 | 0.57 | 0.78 | 0.55 |
| **Bond funds** | 0.61 | 0.50 | 0.61 | 0.48 | 0.57 | 0.43 |
| High yield and world | 0.85 | 0.82 | 0.83 | 0.79 | 0.78 | 0.65 |
| Other | 0.53 | 0.47 | 0.51 | 0.44 | 0.48 | 0.40 |
| **Money market funds** | 0.17 | 0.21 | 0.17 | 0.19 | 0.13 | 0.16 |

[1] The industry average expense ratio is measured as an asset-weighted average.
[2] The 401(k) average expense ratio is measured as a 401(k) asset-weighted average.
Note: Data exclude mutual funds available as investment choices in variable annuities and tax-exempt mutual funds.
Sources: Investment Company Institute and Lipper

*Id*. at 12.

_____

[2] This chart does not account for the strategy of a mutual fund, which may be to mirror an index, a so-called passive management strategy, or may attempt to "beat the market" with more aggressive investment strategies via active management.  Active management funds tend to have significantly higher expense ratios compared to passively managed funds because they require a higher degree of research and monitoring than funds which merely attempt to replicate a particular segment of the market.

75.     Prudent and reasonable plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, leveraging the size of their plan to ensure that well-performing, lower cost investment options are available to plan participants.

76.     This is especially critical because while higher-cost mutual funds may outperform a less-expensive option, such as a passively-managed index fund, over the short term, they rarely do so over a longer term.  *See* Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market? Hardly*, The Washington Post, available at https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices which looked at 2,862 actively managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year). Conversely, mutual funds with the worst performance tend to continue to perform poorly in the future.  Jonathan B. Berk, Jing Xu, *Persistence and Fund Flows of the Worst Performing Mutual Funds*, at 6, (2004) available at http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.421.2127&rep=rep1&type=pdf (attributing continuing poor mutual fund performance to less responsive investors who do not pull their capital from the funds, causing the fund manager to change strategies).

77.     As a result, plan fiduciaries such as Defendants here must be continually mindful of investment options to ensure they do not unduly risk plan participants savings, do not charge unreasonable fees.  Some of the best investment vehicles for these goals are collective trusts, which pool plan participants investments further and provide lower fee alternatives to even institutional and 401(k) plan specific shares of mutual funds.

78.     Plan fiduciaries must also be wary of conflicts of interest that arise when plan administrators and other fiduciaries select proprietary funds as investment options for the plans they administer.  The inherent conflict of interest in such situations can cause proprietary funds to be selected when they are not the most prudent investment option and can cause those same funds to remain as an investment option despite poor performance.

79.     In fact, one recent Pension Research Council working paper found in a study of such situations that "[a]ffiliated funds are more likely to be added and less likely to be removed from 401(k) plans" especially for the worst performing funds.  *See* Pool, Veronika, Clemons Sialm, and Irina Stefenescu, *It Pays to Set the Menu: Mutual Fund investment Options in 401(k) Plans*, at 2 (May 2015).  Moreover, even though plan participants may be aware of the affiliation, due to their documented nativity in investments and general inactive in changing those investments, the study found "participants are not generally sensitive to poor performance and do not undo the men's bias towards affiliated families [of funds]."  *Id*. at 3.

80.     Nor did the fact that fiduciaries could have "superior information about their own proprietary funds" correlate to improved performance.  *Id*.  "[A]ffiliated funds that rank poorly based on past performance but are not deleted from the menu do not perform well in the subsequent year" and thus "the decision to retain poorly-performing affiliated funds is not driven by information about the future performance of these funds."  *Id*. at 3, 26.

81.     Given the vulnerability of Plan participants, who are presented a menu of very limited choices but who are dependent on the retirement income earned by those choices, Plan fiduciaries must be particularly vigilant about the selection and maintenance of affiliated, proprietary funds in their 401(k) plans.

## C.     **Defendants' Breaches of Fiduciary Duty**

**(1)    Defendants Breached their Fiduciary Duty by Failing to Ensure the Plan has Prudent Investment Options for its Participants**

82.    The Supreme Court recently reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble v. Edison, Int'l*, 135 S. Ct. 1823 (2015). *Tibble* held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Id.* at 1828. In so holding, the Supreme Court referenced with approval the Uniform Prudent Investor Act (the "UPIA"), treatises, and seminal decisions confirming the duty.

83.    *Tibble* cites with approval to the UPIA which enshrines trust law and recognizes that "the duty of prudent investing applies both to investing and managing trust assets. . . ." 135 S. Ct. at 1828 (quoting Nat'l Conference of Comm'rs on Uniform State Laws, Uniform Prudent Investor Act § 2(c) (1994)). The official comment explains that "'[m]anaging' embraces monitoring, that is, the trustee's continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments." *Id.* § 2 comment.

84.    As similarly summarized in the Third Restatement:    "***Changes in a company's circumstances, adaptation to trust- and capital-market developments***, fine-tuning, and the like may, of course, justify the selling and buying of properties as an aspect of a prudent plan of asset allocation and diversification …. This is consistent with the trustee's ongoing duty to monitor investments and to make portfolio adjustments if and as appropriate, with attention to all relevant considerations, including tax consequences and other costs associated with such transactions." Restatement (Third) § 90 comment e(1) (emphasis added).

85.    As described *supra*, one of the responsibilities of the Plan fiduciaries is to select investment options which have reasonable and not excessive fees for the performance and quality

of service received, and to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Restatement (Third) of Trusts ch. 17, intro. note (2007). *See also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to produce in the investment function.")  Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in the Plan to determine whether any of the Plan's investments are "improvident," or if there is a "superior alternative investment" to any of the Plan's holdings. *See Pension Ben. Gaur. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 718-19 (2d Cir. 2013).

86.     As the amount of assets under management approaches and exceeds $1 billion, the economies of scale dictate that lower and lower cost investment options will be available to these Plans.  When large plans, particularly those with over $1 billion in assets, have options which approach the retail cost of shares for individual investors or are simply have more expensive than the average institutional shares for that type of investment, a careful review of the Plan and each option is needed for the fidicuries to fulfill their obligations to the Plan participants.

### (a)     2010 Proprietary Funds and Fees Paid

87.     According to the Plan's Form 5500 filed for 2010, of the 22 mutual fund investment options in the Plan, 8 were from proprietary M&T mutual funds, representing over 30% of all mutual fund investments.  However, these proprietary mutual funds charged significantly higher fees than average for performance that most often trailed both the Fund benchmarks and the mutual fund averages.

### (i)     The Intermediate-Term Bond Fund

88.   In June 2011, the MTB U.S. Government Bond reported results for its fiscal year ended April 30, 2011.  As is illustrated, this Fund only outperformed its benchmark for a year, but mostly lagged over the course of ten years investing.



MTB INTERMEDIATE-TERM BOND FUND – INSTITUTIONAL I SHARES†

The graph below illustrates the hypothetical investment of $100,000¹ in the MTB Intermediate-Term Bond Fund (Institutional I Shares) (the "Fund") from April 30, 2001 to April 30, 2011, compared to the Barclays Capital Intermediate Government/Credit Bond Index ("BCIGC")¹,² and the Lipper Short Intermediate Investment Grade Debt Funds Average.¹,²

89.   For this performance, the annual expense ratio was 0.66 (after waivers).

**(ii)    The International Equity Institutional I Fund**

90.   In June 2011, the MTB International Equity Fund, Institutional I shares reported results for its fiscal year ended April 30, 2011.   As is illustrated, the Fund lagged both its benchmark, the Morgan Stanley Capital International-Europe, Australia and Far East Index ("MSCI EAFE") and the Lipper International Multi Cap Core Funds Average since its inception in 2003.

## MTB INTERNATIONAL EQUITY FUND – INSTITUTIONAL I SHARES

The graph below illustrates the hypothetical investment of $100,000[1] in the MTB International Equity Fund (Institutional I Shares) (the "Fund") from August 18, 2003 (start of performance) to April 30, 2011, compared to the Morgan Stanley Capital International—Europe, Australasia and Far East Index ("MSCI EAFE")[1,2] and the Lipper International Multi Cap Core Funds Average.[1,2]



91.     For this performance, the annual expense ratio was 1.34 (after waivers), significantly higher than the average cost of a similar mutual fund.

### (iii)     The Large Cap Growth Fund

92.     In June 2011, the MTB Large Cap Growth Fund reported results for its fiscal year ended April 30, 2011.  As is illustrated, the Fund lagged both its benchmark, the Russell 1000 Growth Index, and the Lipper Large-Cap Growth Fund Average, for nearly the entirely of its existence.

## MTB LARGE CAP GROWTH FUND – INSTITUTIONAL I SHARES

The graph below illustrates the hypothetical investment of $100,000[1] in the MTB Large Cap Growth Fund (Institutional I Shares) (the "Fund") from August 18, 2003 (start of performance) to April 30, 2011, compared to the Russell 1000 Growth[1,2] and the Lipper Large-Cap Growth Funds Average.[1,2]



93. For this performance, the annual expense ratio was 1.04 (after waivers).

### (iv)    The Large Cap Value Fund

94.    In June 2011, the MTB Large Cap Value Fund reported results for its fiscal year ended April 30, 2011.  As is illustrated, the Fund lagged its benchmark, the Russell 1000 Value Index, as it had consistently over the past ten years.  Moreover, the Fund only outperformed the Lipper Large Cap Value Fund Average for the last year.

24

## MTB LARGE CAP VALUE FUND – INSTITUTIONAL I SHARES

The graph below illustrates the hypothetical investment of $100,000[1] in the MTB Large Cap Value Fund (Institutional I Shares) (the "Fund") from August 18, 2003 (start of performance) to April 30, 2011, compared to the Russell 1000 Value Index ("Russell 1000 Value")[1,2], and the Lipper Large Cap Value Funds Average.[1,2]



95.     For this performance, the Fund charged an annual expense ratio of 1.04 (after waivers).

### (v)     The Mid Cap Growth Fund

96.     In June 2011, the MTB Mid Cap Growth Fund reported its results for its fiscal year ending April 30, 2011.

## MTB MID CAP GROWTH FUND – INSTITUTIONAL I SHARES†

The graph below illustrates the hypothetical investment of $100,000[1] in the MTB Mid Cap Growth Fund (Institutional I Shares) (the "Fund") from April 30, 2001 to April 30, 2011, compared to the Russell Mid Cap Growth Index ("Russell Mid Cap Growth"),[1,2] and the Lipper Mid Cap Growth Funds Average.[1,2]



25

97.     For this performance, the Fund charged an annual expense ratio of 1.08 (after waivers), significantly higher than other mutual funds.

### (vi)     The MTB Group of Funds Prime Money Market Fund

98.     In June 2011, the MTB Prime Money Market Fund reported results for its fiscal year ended April 30, 2011.  As is illustrated, the expenses charged to the Fund reduced any potential gain to negative numbers; keeping money in this Fund cost investors.  As of April 2011, the annual expense ratio was 0.23.



### (vii)    The Small Cap Growth Fund

99.     In June 2011, the MTB Small Cap Growth Fund reported results for its fiscal year ended April 30, 2011.  As is illustrated, the Fund did not significantly outperform its benchmark, the Russell 2000 Growth Index, nor the Lipper Small Cap Growth Funds Average.

## MTB SMALL CAP GROWTH FUND – INSTITUTIONAL I SHARES†

The graph below illustrates the hypothetical investment of $100,000[1] in the MTB Small Cap Growth Fund (Institutional I Shares) (the "Fund") from April 30, 2001 to April 30, 2011, compared to the Russell 2000 Growth[1,2] and the Lipper Small Cap Growth Funds Average.[1,2]



100.    For this performance, the Fund charged an annual expense ratio of 1.25 (after waivers), significantly higher than other, similar mutual funds.

### (viii)   MTB Group of Funds U.S. Government Bond Fund

101.    In June 2011, the MTB U.S. Government Bond reported results for its fiscal year ended April 30, 2011.  As is illustrated, the Fund lagged its benchmark, the Barclays Capital U.S. Government Bond Index for a fifth consecutive year.



## MTB U.S. GOVERNMENT BOND FUND – INSTITUTIONAL I SHARES

The graph below illustrates the hypothetical investment of $100,000[1] in the MTB U.S. Government Bond Fund (Institutional I Shares) (the "Fund") from August 18, 2003 (start of performance) to April 30, 2011, compared to the BCUSGB[1,2] and the Lipper General U.S. Government Funds Average.[1,2]

102.    Meanwhile, the expense ratio reported by the Fund was 0.74 (after waivers).

103.    Upon information and belief, the Plan paid WTIA and/or other M&T subsidiaries nearly $1.88 million in fees for the $255.1 million in assets under management in proprietary funds in 2010.  This corresponds to an expense ratio of nearly 0.74, well above what the Plan should have been paying given its size.

104.    If the monies invested in these options had instead been invested in options that cost not even 30 basis points lower, Plan participants would have only spent approximately $1,173,779 in fees in 2010 instead of $1,878,947.  That is a savings of over 37% in fees.

105.    In May 2011, M&T acquired Wilmington Trust, which had both its own 401(k) plan and a number of proprietary mutual funds managed by a subsidiary which were investment options of that plan.  M&T acted as Plan Sponsor of this plan until it merged with the Plan on September 15, 2011.

106.    Upon information and belief, the proprietary funds of Wilmington Trust were liquidated and their assets transferred to M&T Bank's corresponding proprietary funds managed

by MTBIA.  Subsequently, the M&T proprietary funds were renamed "Wilmington Fund" and MTBIA was renamed WTIA.

107.    In 2012, the Plan continued to maintain proprietary mutual funds as investment options despite their unreasonably high fees and generally poor performance.

108.    In August 2013, the Plan sent a "Plan and Investment Disclosure" to Plan participants, outlining the investment options and their corresponding fees and performance.  Of the 27 investment options available, 13 were proprietary mutual funds.[3]

(b)      **2013 Proprietary Funds and Fees Paid**

(i)      **The Wilmington Funds Large Cap Growth Institutional Fund**

109.    In August 2013, the Plan reported on the performance of the Wilmington Funds Large Cap Growth Institutional Fund.  As illustrated in the following chart, the Fund not only lagged its benchmark and the Lipper average, it also lagged another Large Cap Growth mutual fund investment option *already included in the Plan*[4], the T. Rowe Price Growth Stock Fund, in one year, five year and ten year increments. The Defendants had already selected a better performing option in this investment strategy segment, yet continued to include the poorly performing Wilmington Funds Large Cap Growth Institutional Fund.  Even if Defendants wanted to give the Plan participants more options for this kind of investment, it would have been far more reasonable to include the TIAA-CREF Large-Cap Growth Institutional Fund, a more reasonably priced and better performing alternative to the proprietary Wilmington Fund.

---

[3] One investment option available at this time, and throughout the Class Period, was M&T stock.  Thus, at this point, over half the investment options available to Plan Participants were M&T related.

[4] Prudent management of a plan's investments require removal of unnecessary or duplicative funds, especially where one of the funds has significantly higher costs than the other because investors are likely to falsely "diversity" by splitting an investment between multiple investments in the same asset class.  Jill E. Fisch & Tess Wilkinson-Ryan, *Why Do Retail Investors Make Costly Mistakes? An Experiment on Mutual Fund Choice*, 162 U. PA. L. REV. 605, 623, 636-38 (2014).  *See also* James J. Choi, *et al.*, *Why Does the Law of One Price Fail? An Experiment on Index Mutual Funds*, 23 Rev. Fin. Stud. 1405 (2010).



110.    For this historically poor performance, the Fund charged an expense ratio of 1.41[5],

significantly higher than the average of 0.85 for a similar mutual fund, the 0.70 ratio of the T.

Rowe Price option, and the 0.47 ratio of a more reasonable outside alternative, the TIAA-CREF

Large-Cap Growth Institutional Fund.



---

[5] For all 2013 fee prices, the listed price for the Wilmington Funds investments, as well as for others within the Plan's portfolio are quoted from the M&T Bank Retirement Savings Plan and Investment Disclosure of August 2013, attached hereto as Exhibit 1.  Upon information and belief, these prices do not include any fee waivers, which are not permanent and subject to revocation at any time.

### (ii)   The Wilmington Funds Large Cap Value Institutional

111.    In August 2013, the Plan reported on the performance of the Wilmington Funds Large Cap Value Institutional Fund.  As illustrated in the following chart, this Fund also lagged its benchmark the Lipper average, and another Large Cap Value mutual fund investment option, the T. Rowe Price Equity Income Fund, ***already in the Plan*** in one year, five year and ten year increments.  The Fund also lagged the performance of a more reasonably priced alternative, the Vanguard Equity Income Fund Admiral Shares.



112.    For this historically poor performance, the Fund charged an expense ratio of 1.17, significantly higher than the average of 0.83 for a similar mutual fund, the 0.68 ratio of the T. Rowe Price option, and the 0.21 ratio of a more reasonable outside alternative.



### (iii)    The Wilmington Funds Mid Cap Growth Institutional Fund

113.    In August 2013, the Plan reported on the performance of the Wilmington Funds Mid Cap Growth Institutional Fund.  As illustrated in the following chart, this Fund generally mirrored its benchmark and Lipper averages in one year, five year and ten year increments.  The Fund significantly lagged the more consistent performance of a more reasonably priced alternative, the T. Rowe Price Institutional Mid-Cap Equity Growth Fund.



114.    For this average performance, the Fund charged an expense ratio of 1.32, significantly higher than the average of 0.85 for a similar mutual fund and the 0.62 ratio of the T. Rowe Price option.



      **(iv)    The Wilmington Funds Multi-Manager International Institutional Fund**

115.    In August 2013, the Plan reported on the performance of the Wilmington Funds Multi-Manager International Institutional Fund.  As illustrated in the following chart, this Fund generally mirrored its benchmark and Lipper averages in one year, five year and ten year increments.  The Fund significantly lagged the more consistent performance of a more reasonably priced alternative, the T. Rowe Price Institutional Concentrated International Equity Fund, as well as an alternative ***already within the Plan***, the Harbor International Fund Institutional Fund.



116.    For this average-to-poor performance, the Fund charged an expense ratio of 1.62,

significantly higher than within-Plan alternative's ratio of 0.78 and the 0.75 ratio of the T. Rowe

Price option.



(v)     **The Wilmington Funds Multi-Manager Real Asset Institutional Fund**

117.    In August 2013, the Plan reported on the performance of the Wilmington Funds Multi-Manager Real Asset Institutional Fund.  As illustrated in the following chart, this Fund performed generally well against a benchmark and an alternative investment outside the Plan, but did so for nearly double the average fees and more than double that of the alternative investment.



**(vi)     The Wilmington Funds Small Cap Growth Institutional Fund**

118.     In August 2013, the Plan reported on the performance of the Wilmington Funds Small Cap Growth Institutional Fund.  As illustrated in the following chart, this Fund significantly lagged its benchmark and Lipper averages in one year, five year and ten year increments.  The Fund's performance also failed to compare to a more reasonably priced alternative, the T. Rowe Price New Horizons Fund.



119.     For this incredibly poor performance, including a 5 year loss of -0.45%, the Fund charged an expense ratio of 1.39, compared to the average Small Cap Growth fee of 0.85 and the fee charged by the T. Rowe Price alternative of 0.8.



**(vii)    The Wilmington Funds Small Cap Strategy Fund**

120.    In August 2013, the Plan reported on the performance of the Wilmington Funds Small Cap Strategy Fund.  As illustrated in the following chart, this Fund either lagged or nearly matched its benchmark and Lipper averages in one year, five year and ten year increments. However, the Fund's performance consistently lagged both an alternative Small Blend style mutual fund *already within the Plan's investment options*, the T. Rowe Price Small Cap Value Fund, and a similar investment-style mutual fund outside the Plan, the Vanguard Strategic Small Cap Equity Fund.



121.    For this average at best performance, the Fund charged an expense ratio of 1.39, compared to the average fee of 0.5, the 0.98 charged by the T. Rowe Price alternative or the 0.40 fee charged by the Vanguard alternative.[6]



(viii)    **The Wilmington Funds Aggressive Asset Allocation Fund**

---

[6] The Vanguard Strategic Small Cap Equity Fund offered retail or investor shares at a price of 40 bps during this time period.  Upon information and belief, the actual price of institutional level shares was significantly lower.  However, as can been seen by the chart, even retail shares of the Vanguard alternative were less than one-third the price of the proprietary Wilmington Funds Small Cap Strategy Fund as offered to Plan participants.

122.    In August 2013, the Plan reported on the performance of the Wilmington Funds Aggressive Asset Allocation Fund.  As illustrated in the following chart, this Fund consistently lagged Lipper averages, as well as a possible reasonable alternative mutual fund, the Fidelity Asset Manager 85% Fund, in one year, five year and ten year increments.  In fact, in this asset class, the alternative investment, the Lipper average and the S&P 500 Index tracked each other nearly identically over ten years, with the alternative investment differentiating itself in the last five years with exceptional performance making the proprietary Wilmington Fund's poor performance especially noteworthy.



123.    For this poor performance, the Fund charged expenses of 1.85, compared to an average of 0.5 and 0.78 for the Fidelity fund alternative.



**(ix)     The Wilmington Funds Strategic Allocation Conservative Institutional Fund**

124.    In August 2013, the Plan reported on the performance of the Wilmington Funds Strategic Allocation Conservative Institutional Fund.  As illustrated in the following chart, this Fund consistently performed conversely to its chosen benchmark, the Barclays U.S. Aggregate Bond Index.  In contrast, the Vanguard Wellesley Income Fund, another Conservative Allocation mutual fund posted consistent, less volatile performance.



125.    For this performance, the Fund charged an expense ratio of 1.7, significantly higher than the suggested Vanguard alternative's charge of 0.18.



(x)    **The Wilmington Funds Intermediate Term Bond Funds**

126.    In August 2013, the Plan reported on the performance of the Wilmington Funds two Intermediate Term Bond Funds available as investment options in the Plan.  As illustrated in the following chart, the Board Market Bond Institutional and the Intermediate Term Bond Institutional I outperformed their benchmarks, but not the Lipper averages.  In contrast, the SEI Core Fixed Income Fund and the Baird Aggregate Bond Fund Institutional both consistently outperformed both the benchmarks and the Lipper averages in the near and far term, while doing so at nearly two-thirds less the price.  In other words, the proprietary Intermediate Term Bond Funds gave Plan participants ***average performance at nearly twice the average price***.





**(xi)   The Wilmington Funds Short Duration Government Bond Institutional Fund**

127.    In August 2013, the Plan reported on the performance of the Wilmington Funds Short Duration Government Bond Institutional Fund.  As illustrated in the following charts, the Fund outperformed its benchmark and the Lipper average, but not a far more reasonably priced alternative, the DFA Short-Term Government Portfolio Fund.  While the Fund charged an expense ratio of 0.93, the DFA Short-Term Government Portfolio Fund charged a mere 0.2.  Again, the proprietary fund gave Plan Participants somewhat better than average returns at **_over twice the average price_**.





128.    In total, the proprietary fund investment options available in the Plan in 2013 averaged an expense ratio cost of 1.33.  The more reasonably priced alternatives, in contrast, averaged an expense ratio cost of 0.47, or nearly 65% less than the fees charged to Plan participants.

129.    Moreover, for some investment strategies, such as the Large Cap Growth  strategy, the Plan included both a propriety and non-propriety alternative.  *See supra*.  ***The propriety funds all performed significantly worse while charging higher fees than the non-propriety alternative.***  The continued inclusion of these poorly performing proprietary funds when more reasonably-priced and better-performing funds had already been approved for inclusion in the Plan was done solely to benefit the Defendants at the expense of the Plan participants.

(c)    <u>2014 Proprietary Funds and Fees Paid</u>

130.    In July 2015, the Wilmington Funds reported the performance of their mutual funds as of April 30, 2015.  *See* Form N-CSR for fiscal year ending April 30, 2015.  Tellingly, they did not include Lipper averages in their performance metrics, instead comparing their mutual fund performance only to benchmark indices, or occasionally, indices of their own design.

(i)    **The Broad Market Bond Fund**

131.    In July 2015, the Wilmington Funds Broad Market Bond Fund reported results for its fiscal year ended April 30, 2015.  As is illustrated, the Fund underperformed its benchmark, Barclays Capital U.S. Aggregate Bond Index, a continuation of its performance for at least the previous seven years.  There was no mention of the Lipper comparator, the Corporate A-Rated Debt Funds Average, which was included in previous years' reports.

## WILMINGTON BROAD MARKET BOND FUND – CLASS I

The graph below illustrates the hypothetical investment of $1,000,000[1,2] in the Wilmington Broad Market Bond Fund (Class I) (the "Fund") from April 30, 2005 to April 30, 2015, compared to the Barclays Capital Aggregate Bond Index ("BCAB").[2]



132.   For this historically poor performance, the Fund charged an after waivers fee of 0.55, compared to the average cost of a bond fund in 2014 of 0.43.

### (ii)   The Wilmington Funds Mid Cap Growth Fund

133.   In June 2015, the Wilmington Funds Mid Cap Growth Fund reported results for its fiscal year ended April 30, 2015.  As is illustrated, the Fund underperformed its benchmark, the Russell Mid Cap Growth Index for second year. There was no mention of the Lipper comparator, the Mid Cap Growth Funds Average, which was included in previous years' reports.

## WILMINGTON MID-CAP
## GROWTH FUND – Class I

The graph below illustrates the hypothetical investment of $1,000,000[1,2] in the Wilmington Mid-Cap Growth Fund (Class I) (the "Fund") from April 30, 2005 to April 30, 2015, compared to the Russell Mid Cap Growth.[2]



134.    For this poor performance, the Fund charged an after waivers fee of 1.08, double the average cost of an equity fund in 2014 of 0.54.

### (iii)    Multi-Manager Real Asset Fund[7]

135.    In July 2015, the Wilmington Funds Multi-Manager Real Asset Fund reported results for its fiscal year ended April 30, 2015.  As is illustrated, the Fund slightly outperformed its benchmark, the Barclay Capital World Government Inflation-Linked Bond Index.  It more seriously outperformed the Real Asset Blended Index, "calculated by the investment advisor" whose method of calculation of this index changed twice over from inception of the Fund.[8]

---

[7] This Fund is misnamed as the Multi-Manager Real Estate Fund in the Plan's 2014 Form 5500.

[8] As described in the N-CSR for fiscal year ended April 30, 2015, at 13, "The Real Asset Blended Index is calculated by the investment advisor and is currently based on a weighting of the following indices: 50% Barclays World Government ILB Index, 35% S&P Developed Property Index, 15% Dow Jones-UBS Commodity Index. For the period January 1, 2009 through December 31, 2010, the Real Asset Blended Index was based on the following weightings of the indices: 40% Barclays World Government ILB Index, 30% S&P Developed Property Index and 30% Dow Jones-UBS Commodity Index. For the period since inception through December 31, 2008 the Real Asset Blended Index was based on the following weightings of the indices: 50% Barclays US Treasury Inflation Protected Securities (TIPS) Index, 30% FTSE NAREIT Equity Index and 20% Dow Jones-UBS Commodity Index."

## WILMINGTON MULTI-MANAGER REAL ASSET FUND – CLASS I

The graph below illustrates the hypothetical investment of $1,000,000[1,2] in the Wilmington Multi-Manager Real Asset Fund (Class I) (the "Fund") from April 30, 2005 to April 30, 2015, compared to the BCWGILB[2] and the Real Asset Blended Index.[2,3]



136.    For this appearance of performance, the Fund charged an expense ratio of 1.11, almost double the average cost of a high yield and/or world bond fund in 2014, of 0.65.

### (iv)    The Small Cap Strategy Fund

137.    In July 2015, the Wilmington Funds Small Cap Strategy Fund reported results for its fiscal year ended April 30, 2015.  As is illustrated, the Fund failed to meet its benchmarks, the Russell 2000 Index any point in the previous ten years.  Moreover, this chart fails to include a secondary benchmark that was used in previous years, the S&P Small Cap Index, which also significantly outperformed the Fund.

## WILMINGTON SMALL-CAP STRATEGY FUND – Class I

The graph below illustrates the hypothetical investment of $1,000,000[1,2] in the Wilmington Small-Cap Strategy Fund (Class I) (the "Fund") from April 30, 2005 to April 30, 2015, compared to the Russell 2000 Index.[2]



138.    For this paltry performance, the Fund charged an expense ratio of 0.34.  However, the Fund's poor lifetime performance did not merit continued inclusion in the Plan's investment options.

### (v)    The Strategic Allocation Aggressive Fund[9]

139.    In July 2015, the Wilmington Funds Strategic Allocation Aggressive Fund reported results for its fiscal year ended April 30, 2015.  As is illustrated, the Fund failed to meet its primary benchmark, the Russell 3000 Index, since 2009.  In fact, the gap between the benchmark and the Fund's performance had considerably widened in the last three years.  Nor was the Fund consistently meeting other benchmarks, including the Aggressive Blended Index,[10] another investment advisor created index.

---

[9] This Fund is misidentified this Fund as the Aggressive Asset Allocation Fund in the Plan's 2014 Form 5500.

[10] The Aggressive Blended Index was defined in the N-CSR for the year ending April 30, 2015 as an index "currently based on a weighting of the following indices: 48% Russell 3000 Index, 32% MSCI All Country World ex-U.S. Index, 7% HFRX Global Hedge Fund Index, 5% Barclays World Government Inflation-Linked Bond Index, 3.5% S&P Global Developed Property Index, 1.5% Dow Jones-UBS Commodity Index, 3% Citigroup 3-Month T-Bill."



140.    For this abysmal performance, the Fund charged an expense ratio of 1.45, nearly

triple the price of the average price of a blended mutual fund in 2014 of 0.55.

(vi)    The Strategic Allocation Conservative Fund[11]

141.    In July 2015, the Wilmington Funds Strategic Allocation Conservative Fund

reported results for its fiscal year ended April 30, 2015.  As is illustrated, the Fund failed to meet

its primary benchmark, the Barclays Capital U.S. Aggregate Bond Index, since 2008.  The Fund

also failed to meet the Conservative Blended Index,[12] though by less severe margins.

---

[11] The Plan misidentified this Fund as the Conservative Asset Allocation Fund in the Plan's 2014 Form 5500.

[12] The conservative Blended Index was a "weighting of the following indices: 53% Barclays U.S. Aggregate Bond Index, 7.5% HFRX Absolute Hedge Fund Index, 7.5% HFRX Global Hedge Fund Index, 7.2% Russell 3000 Index, 7.0% Barclays Global Aggregate ex-U.S. Index, 5.0% Barclays World Government Inflation-Linked Bond Index, 4.8% MSCI All Country World ex-U.S. Index, 3.5% S&P Global Developed Property Index, 1.5% Dow Jones-UBS Commodity Index, 3% Citigroup 3-Month T-Bill."

## WILMINGTON STRATEGIC ALLOCATION CONSERVATIVE FUND – CLASS I

The graph below illustrates the hypothetical investment of $1,000,000[1,2] in the Wilmington Strategic Allocation Conservative Fund (Class I) (the "Fund") from December 19, 2005 (start of performance) to April 30, 2015, compared to the BCAB[2] and the Conservative Blended Index.[2,3]



142.    For this historical poor performance, the Fund charged an after waivers expense ratio of 1.21, nearly double the average cost of a high yield and/or world bond fund in 2014 of 0.65.

### (vii)    The Intermediate Term Bond Fund

143.    In July 2015, the Wilmington Funds Intermediate Term Bond Fund reported results for its fiscal year ended April 30, 2015.  As is illustrated, the Fund slightly exceeded its benchmark, the Barclay's Capital Intermediate Government/Credit Bond Index.

## WILMINGTON INTERMEDIATE-TERM BOND FUND – Class I

The graph below illustrates the hypothetical investment of $1,000,000[1,2] in the Wilmington Intermediate-Term Bond Fund (Class I) (the "Fund") from April 30, 2005 to April 30, 2015, compared to the Barclays Capital Intermediate Government/Credit Bond Index ("BCIGC").[2]



144.    For this performance, the Fund also charged higher than average fees of 0.53, ten basis points higher than the 2014 average of 0.43 for a bond fund.

145.    In July 2015, the Wilmington Funds Multi-Manager International Fund reported results for its fiscal year ended April 30, 2015.  As is illustrated, the Fund consistently failed to meet its benchmark, the Morgan Stanley Capital International All Country World Index ex-US, for nearly all of the preceding ten years.

## WILMINGTON MULTI-MANAGER INTERNATIONAL FUND – CLASS I†

The graph below illustrates the hypothetical investment of $1,000,000[1,2] in the Wilmington Multi-Manager International Fund (Class I) (the "Fund") from April 30, 2005 to April 30, 2015, compared to the Morgan Stanley Capital International All Country World Index ex-US (Net, USD) ("MSCI ACWI ex-US").[2]



146.    For this consistently lackluster performance, the Fund charged an expense ratio of 1.21, nearly double the 0.67 average for world equity mutual funds in 2014.

### (viii)   The Short Duration Government Bond Fund and the Short Term Bond Fond

147.    Originally two separate funds, the Wilmington Funds Short Duration Government Bond Fund was acquired by the Wilmington Funds Short-Term Corporate Bond Fund, then renamed the Wilmington Funds Short Term Bond Fond prior to April 30, 2015.

148.    In July 2015, the Wilmington Funds Short Term Bond Fund reported results for its fiscal year ended April 30, 2015.  As is illustrated, the Fund met but did not significantly exceed its benchmark in the prior six years.



WILMINGTON SHORT-TERM BOND FUND – CLASS I

The graph below illustrates the hypothetical investment of $1,000,000[1,2] in the Wilmington Short-Term Bond Fund (Class I) (the "Fund") from April 30, 2005 to April 30, 2015, compared to the Barclays Capital 1-3 Year U.S. Government/Credit Bond Index ("BC1-3GCB").[2]

149.    For this average performance, the Fund charged an after waivers expense ratio of 0.48, higher than the 2014 bond fund average of 0.43.

150.    Upon information and belief, Plan Participants paid WTIA and/or other M&T subsidiaries nearly $1.78 million in fees on approximately $195.3 million in investments in proprietary funds.

151.    In total, the Wilmington Funds investment options in the Plan in 2014 had an average expense ratio of 0.84.  When the actual market value of the investments is used, the average expense ratio is 0.91.

152.    If the monies invested in these options had instead been in options that had average costs Plan participants would have only spent approximately $1,020,584 in fees in 2014 instead of $1,771,056.  That is a savings of over 32% in fees.

153.    Despite these high fees and generally poor performance, these options were not removed from the Plan.

154.    In fact, upon information and belief, these proprietary options or their successor funds remain in the Plan despite fees significantly higher than average and sustained poor performance.

155.    Upon information and belief, because of their relatively high fees and poor performance, these the proprietary mutual funds remain in the Plan because of the benefit they return to Defendants' and their affiliated companies.

156.    Moreover, upon information and belief, there has been no systematic review of the Plan's investments as a whole, or individual's investments, at any time prior to or during the Class Period to ensure that Plan participants have access to a menu of properly vetted investment options that take into account both performance and cost.  Upon information and belief, no such process exists for the Plan, to the detriment and cost of Plan participants.

**(2)     Defendants Breached their Fiduciary Duty by Failing to Use More Collective Trusts Instead of Higher Cost Mutual Funds**

157.    As explained by the Wall Street Journal, collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds and cash.  Regulated by the Office of the Comptroller of the Currency rather than the Securities and Exchange

Commission, collective trusts have simply disclosure requirements, and cannot advertise nor issue formal prospectuses. As a result, their costs are much lower, with less or no administrative costs, and less or no marketing or advertising costs. *See* Powell, Robert, Not Your Normal Nest Egg, The Wall Street Journal, March 2013, available at http://www.wsj.com/articles/SB10001424127887324296604578177291881550144. Collective trusts fees in fact can be between 15 to 60 bps lower than the same asset class mutual fund.

158.    Another feature of collective trusts is that they are customizable to a particular employer. "Plan sponsors can work with banks and trust companies to create a target-date fund that has a specific asset allocation or glide path built around its workforce and employee-benefit package." *Id*.

159.    The Plan Sponsor and Plan Administrator were at all times during the class period aware of the benefits of collective trust vehicles compared to mutual funds. At least one collective trust was available among the Plan's investment options, the Wilmington Trust Stable Value Fund (under various names) since 2011.

160.    Upon information and belief, rather than use their unique position to benefit the Plan and its participants by offering these same asset class investments in a collective trust, Defendants instead opted to offer the higher cost proprietary mutual funds because of the benefit they return to Defendants' and their affiliated companies.

161.    Upon information and belief, the decision to keep the proprietary mutual funds as investment options instead of offering these investments in collective trust vehicles cost the Plan's participants millions of dollars in excess fees over the course of the Class Period.

### (3)    Defendants Breached their Fiduciary Duty to Avoid Conflicts of Interest

162.     By selecting and retaining the mutual funds run by affiliated companies, Defendants have acted at all times in the interest of the Company, and have not acted solely in the interests of the Plan participants as is required of a fiduciary under ERISA, who are required to serve the Plan loyally with an "eye single" to the Plan.  *See generally Mertens v. Hewitt Assoc.*, 508 U.S. 248, 251-52 (1993); *Hahneman Univ. Hosp. v. All Shore, Inc.*, 514 F. 3d 300, 309 (3d Cir. 2008); 29 U.S.C. § 1104(a)(1)(B).

163.     Defendants have a conflict of interest that prevented them from carrying out their fiduciary duties in a manner consistent with ERISA.  Despite this conflict of interest, Defendants have failed to appoint fiduciaries who could carry out their duties to protect the Plan's participants in a manner consistent with ERISA or to take other appropriate steps to address the conflict.

## CLAIMS FOR RELIEF UNDER ERISA

164.     At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

165.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

166.     ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties impose upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

167.    ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to plan solely in the interest of the participants and their beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and family with such matters would use in the conduct of an enterprise of a like character and with like aims.

168.    These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F. 2d 263, 272 n.8 (2d Cir. 1982).  They entail, among other things:

> (a)    The duty to conduct an independent and thorough investigation into, and continually to monitor the merits of all the investment alternatives to a plan;
>
> (b)    A duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;
>
> (c)    A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform then the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

169.    ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable

56

for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

170.    Plaintiff therefore brings this action under the authority of ERISA §502(a) for Plan-wide relief under ERISA §409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants for violations under ERISA §404(a)(1) and ERISA §405(a).

## FIRST CLAIM FOR RELIEF
### Failure to Prudently and Loyally Manage the Plan's Assets
### (Breaches of Fiduciary Duties in Violation of ERISA § 404 and § 405 by All Defendants)

171.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

172.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

173.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.  Defendants were responsible for ensuring that all investments available to the Plan participants were prudent and that such investments were consistent with the purpose of the Plan.  Defendants are liable for losses and excessive fees incurred as a result of such investments being imprudent.

174.     A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.     ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

175.     Moreover, ERISA § 404 (a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on plan fiduciaries a duty of loyalty, that is, a duty to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

176.     Defendants' duty of loyalty and prudence obligates them to speak truthfully to participants, not to mislead them regarding the Plan or its assets, and to disclose information that participants need to order to exercise their rights and interests under the Plan.  This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding Plan investments/investment options such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan.

177.     Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period, these Defendants knew or should have known that, as described herein, the proprietary funds were nor suitable and appropriate investments for the Plan.  The proprietary funds included in the Plan during the Class Period, whether by excessive fees or sustained, poor

performance, clearly did not serve the Plan's stated purpose. Yet, during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to protect Plan participants from the inevitable excessive costs and the loss of earnings that resulted.

178.     Defendants additionally breached their duties to prudently and loyally manage the Plan's assets by failing to have in place a method of systematic review both of the Plan's individual investment options and of the portfolio as a whole in order to ensure that the investments were suitable and appropriate for the objectives of the Plan.

179.     Defendants further breached their duties of loyalty and prudence by failing to divest the Plan of these proprietary funds when they knew or should have known that it was not a suitable and appropriate Plan investment.

180.     Defendants further breached their duties of loyalty and prudence by failing to ensure that participants liquidated their investments in the Proprietary funds and transferred the sale proceeds to the other investment options available in the Plan. With actual or constructive knowledge that Plan participant did not have full and complete information about the Company's interest in these funds, and thus were unable to make fully informed decisions about where to retain their holdings in the proprietary funds, Defendants had the fiduciary obligation to either inform Plan participants of the need to take action to protect their financial interest, or, if necessary, to liquidate the Plan's holdings of the proprietary funds on participants' behalf to ensure that they did not suffer a financial loss.

181.     Defendants also breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the self-interest of the Company in retaining the excessively expensive and poorly performing proprietary fund

investment options.  Defendants had or should have had knowledge of such breaches by other Plan fiduciaries, yet made no effort to remedy them.

182.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of the retirement investment.  Had Defendants taken appropriate steps to comply with their fiduciary obligations, participants could have liquidated some or all of their holdings in the proprietary funds and thereby eliminated, or at least reduced, losses to the Plan.

183.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries and Provide Them with Accurate Information**
**(Breaches of Fiduciary Duties in Violation of § 404 by All Defendants)**

184.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

185.    At all relevant times, as alleged above, the Company were fiduciaries to the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

186.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of these Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries, including without limitation, the members of the various Committees and the investment managers and others to whom fiduciary responsibilities were delegated.

187.    The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries.  In this case, that means that the monitoring fiduciaries had the duty to:

(a)     Ensure that the monitored fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties.  They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Plan's participants;

(b)     Ensure that the monitored fiduciaries are provided with adequate financial resources to do their job;

(c)     Ensure that the monitored fiduciaries have adequate information to do their job of overseeing the Plan's investments;

(d)     Ensure that the monitored fiduciaries have ready access to outside, impartial advisors when needed;

(e)     Ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investments; and

(f)     Ensure that the monitored fiduciaries report regularly to the monitoring fiduciaries.  The monitoring fiduciaries must then review, understand, and approve the conduct of the hand-on fiduciaries.

188.   Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a Plan's assets, and must take prompt and effective action to protect a Plan and its participants when they are not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know and reasonably should know that the monitored fiduciaries must have in order to prudently manage a Plan and a Plan's assets.

189.    The Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to disclose the conflict of interest that existed between the Company and the proprietary funds, (b) failing to monitor and evaluate the performance of the proprietary funds such that the Plan lost millions of dollars to excessive fees and poor fund performance, (c) failing to monitor the processes and policies by which the Plan's investments were selected, allowing the Plan's assets to remain the imprudent proprietary funds rather than in lower fee, similar mutual funds, better performing investments or other investment alternatives such as collective trusts, (d) failing to remove the proprietary funds as investment options due to their imprudence and unreasonable expense, and (e) failing to remove the fiduciaries who had maintained the proprietary funds as investment options despite the conflict of interest, the excessive expense, and the poor performance of the Funds.

190.    Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

191.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

192.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## CAUSATION

193.    The Plan suffered millions of dollars in losses because substantial assets of the Plan were imprudently invested, or allowed to be invested by Defendants, in proprietary funds during the Class Period, in breach of Defendants' fiduciary duties, as reflected in the diminished account balances of the Plan's participants.

194.    Had Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plan and its participants would have avoided a substantial portion of the losses that they suffered through the Plan's continued investment in the proprietary funds.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

195.    As noted above, as a consequence of Defendants' breaches, the Plan suffered significant losses.

196.    ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary … who breaches any of the … duties imposed upon fiduciaries … to make good to such plan any losses to the plan…"  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate …"

197.    With request to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the Plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the Plan's assets to which they would have been if the Plan had been properly administered.

198.     Plaintiff, the Plan, and the Class are therefore entitled to relief from Defendants in the form of:  (1) monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs; (5) interest on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

199.     Each Defendant is jointly liable for the acts of the other Defendants as co-fiduciary.

## JURY DEMAND

200.     Plaintiff demands a jury.

## PRAYER FOR RELIEF

201.     WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.     A Declaration that the Defendants, and each of them, have breached their fiduciary duties to the participants;

B.     A Declaration that the Defendants, collectively and separately, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants

made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

       D.      Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as a result of breaches of fiduciary duty;

       E.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

       F.      An Order that Defendants allocate the Plan's recoveries to the accounts of all participants who had any portion of their account balances invested in the proprietary funds maintained by the Plan in proportion to the accounts' losses attributable to excessive fees and underperformance of the proprietary investments;

       G.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

       H.      An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

       I.      An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

Dated:  September 1, 2016

Respectfully submitted,

By:  _/s/ Lucinda Lapoff_____
Lucinda Lapoff, Esq.
TREVETT CRISTO
2 State Street, Suite 1000
Rochester, NY 14614
Tel:  (585) 454-2181
Fax:  (585) 454-4026
Email:  clapoff@trevettcristo.com

**KESSLER TOPAZ MELTZER
   & CHECK, LLP**

Edward W. Ciolko
(*pro hac vice* motion to be filed)
Donna Siegel Moffa
(*pro hac vice* motion to be filed)
Mark K. Gyandoh
(*pro hac vice* motion to be filed)
Julie Siebert-Johnson
(*pro hac vice* motion to be filed)
280 King of Prussia Road
Radnor, PA 19087
Tel:  (610) 667-7706
Fax:  (610) 667-7056
Email:  eciolko@ktmc.com
Email:  dmoffa@ktmc.com
Email:  mgyandoh@ktmc.com
Email:  jsjohnson@ktmc.com

***Counsel for Plaintiff***